UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Thomas Mlodzinski *et al.*

     v.                          Civil No. 08-cv-289-JL
                                      Opinion No. 2010 DNH 114
Michael F. Lewis *et al.*

**O R D E R**

This case raises questions about the scope of law enforcement officers' authority to detain the occupants of a premises while executing valid search and arrest warrants there. Plaintiffs Thomas Mlodzinski, his wife Tina Mlodzinski, and their daughter, Jessica, have sued a number of officers who took part in executing warrants for the arrest of Tina's then-17 year-old son, Michael Rothman, for allegedly beating another man with a nightstick, and for the search of the Mlodzinskis' home for that nightstick.  The Mlodzinskis say that, while executing the warrants, officers handcuffed them, pointed assault rifles at the heads of Tina and Jessica--who was 15 years old at the time--for several minutes after they had been handcuffed, and left them in handcuffs for nearly an hour, while interrogating them about the location of the nightstick, as well as the alleged assault.

The Mlodzinskis claim that these actions amounted to unreasonable seizures and excessive force in violation of the Fourth Amendment, and thus actionable under 42 U.S.C. § 1983, as

well as common-law assault and battery, false arrest, and false
imprisonment.  The defendants, including three officers from the
Bristol Police Department and thirteen officers from the Center
of New Hampshire Special Operations Unit ("CNHSOU") who
participated in executing the warrants, have moved for summary
judgment.  They argue that they legitimately detained the
Mlodzinskis during the search and used reasonable force to do so
but that, even if not, they are entitled to qualified immunity
from the constitutional claims and official immunity from the
common-law claims.

After hearing oral argument, the court grants the
defendants' motions for summary judgment in part and denies them
in part.  Taking the evidence in the light most favorable to the
Mlodzinskis, a rational jury could find that they were subjected
to excessive force by the Bristol officers and certain of the
CNHSOU officers, in violation of the Fourth Amendment.  Also
taking the evidence in the light most favorable to the
Mlodzinskis, the court cannot conclude that reasonable officers
in the defendants' position would have believed their actions
were consistent with the Mlodzinskis' clearly established Fourth
Amendment right to be free from excessive force, so the
defendants are not entitled to summary judgment on the basis of
qualified immunity.  For largely the same reasons, a rational

jury could find that certain of the CNHSOU officers committed common-law assault and battery against Tina and Jessica Mlodzinski, and that those defendants do not enjoy official immunity from those claims.

But the Bristol officers are entitled to summary judgment on the Mlodzinskis' claims that, apart from the use of allegedly excessive force, they were unreasonably seized under the Fourth Amendment, or unlawfully imprisoned at common law, during the execution of the search warrant because that detention lacked probable cause or was accompanied by attempts to interrogate them.  Furthermore, at oral argument, the Mlodzinskis dropped all of their claims against a number of the CNHSOU officers, so summary judgment will enter in their favor as well.[1]

## I.   **Applicable legal standard**

Summary judgment is appropriate where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."

---

[1]In their summary judgment papers, the Mlodzinskis also waived their common-law assault and battery claims against the Bristol defendants, as well as any claims against either the Town of Bristol itself or the CNHSOU itself for the alleged constitutional violations by their officers under Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).

Fed. R. Civ. P. 56(c)(2).  Under this rule, "[o]nce the moving party avers an absence of evidence to support the non-moving party's case, the non-moving party must offer 'definite, competent evidence to rebut the motion.'" Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)).

Where, however, "the party moving for summary judgment bears the burden of proof on an issue, he cannot prevail unless the evidence that he provides on that issue is conclusive." EEOC v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de P.R., 279 F.3d 49, 55 (1st Cir. 2002) (quotation marks omitted).  As discussed infra, this standard applies to the defendants' arguments for qualified immunity from the constitutional claims, and privilege and official immunity from the state-law claims, because they bear the burden of proof on each of those defenses.

In ruling on a motion for summary judgment, the "court must scrutinize the record in the light most flattering to the party opposing the motion, indulging all reasonable inferences in that party's favor." Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003).  The following facts are set forth accordingly, though the court has made an effort to note the defendants' version of events where appropriate.

4

II.  **Background**

A.  **The investigation**

In late July 2006, defendants Sergeant Michael Lewis and Officer Gordon Ramsay, of the Bristol Police Department, responded to a report of an assault on Central Street in the town.  Near the scene, they located 21 year-old Jeffrey Burchfield.  When asked about the blood on his clothes, Burchfield said that it belonged to one Brandon Stachulski, whom Burchfield had "beat[en] up" because Stachulski "had been running his mouth about [Burchfield's] girlfriend."  Burchfield said that he had been accompanied by another "kid" who also "had a problem with" Stachulski, but claimed not to know that kid's name. Following his apprehension, Burchfield was taken to the Bristol police station, processed, and released on his own recognizance.

A few days later, Stachulski, age 19, arrived at the station to speak with Sergeant Lewis.  Stachulski named the other person who attacked him as 17 year-old Michael Rothman, and said that Rothman "had an expandable baton during the incident and struck [Stachulski] several times over his body."  Lewis noted that Stachulski bore "several clearly visible marks, which were consistent with the use of a night stick, on his upper body."

5

Stachulski told Lewis where Rothman lived and that he "is known to carry a firearm."[2]

Based on this information, Sergeant Lewis promptly secured warrants to arrest Rothman on a charge of second-degree assault and to search his residence, on South Main Street in Bristol, for the nightstick.[3]  The warrants issued from the Plymouth District Court around 9:30 p.m., and authorized their execution at "any time of the day or night."  Lewis then contacted defendant Robert Cormier, the commander of the defendant Central New Hampshire Special Operations Unit, seeking its assistance in executing the warrants, which Lewis faxed to Cormier along with their supporting affidavits.  At 11 p.m., Lewis set up two surveillance teams, each comprised of two Bristol police officers, outside

---

[2]The defendants have pointed to no evidence in the record as to what else, if anything, Stachulski told Lewis, or Lewis asked Stachulksi, about Rothman's alleged firearm possession, or how Stachulski came by his professed knowledge that Rothman "is known to carry" one.  Lewis acknowledged at his deposition that Stachulski did not say he had actually seen Rothman with a firearm.

[3]In New Hampshire, second-degree assault is a class B felony, see N.H. Rev. Stat. Ann. § 631:2, I, punishable by in excess of one year but not in excess of seven years' imprisonment, see id. § 625:9, III(a)(2).

Rothman's residence, where Lewis knew that plaintiffs Thomas and Tina Mlodzinski also resided.[4]

The CNSHOU is comprised of officers chosen from the police departments of a number of towns in central New Hampshire and is overseen by a board chosen from among the police chiefs of those towns.  Its officers "are trained for high-risk warrant entries." During these operations, as a matter of standard operating procedure, they carry automatic assault rifles, with the safeties off, and wear military-style camouflaged uniforms and helmets.

Sergeant Lewis believed that executing the warrants against Rothman "posed a high risk of danger based upon the viciousness of the assault and the allegations that Rothman was armed with an expandable baton and possibly a gun."  Lewis also considered "the size of the structure occupied by Rothman and the likelihood that there would be other persons present."  In response to Lewis's communications, Commander Cormier told 15 other CNHSOU officers to gather at the Bristol police station.  There, Lewis told Cormier that Rothman "had bludgeoned another individual, cracked his skull multiple times, and basically left him to die . . . and made statements that, you know, he would kill anyone if they

---

[4]According to the record, the surveillance teams did not observe anything of note.

ratted on him or told on him." If these accusations have any support in the record, the defendants have not identified it.[5]

Commander Cormier decided to use the assembled CNSHOU team to execute the warrants. Furthermore, according to Sergeant Lewis, the team would enter before sunrise "to maximize the surprise for Rothman and thereby reduce the possibility of injury to police officers and third parties and to limit Rothman's opportunity to escape and to dispose of the night stick."

**B.   The entry**

Just before 4 a.m. the next morning, the Mlodzinskis were awakened by the sound of a battering ram breaking down the front door to their three-bedroom apartment, located on the second floor of a two-family house. Inside the apartment, the front door and the door to each of the bedrooms opens onto a central hallway. Then 15 year-old Jessica Mlodzinski, clad in underwear and a T-shirt, got out of her bed in response to the noise. She opened the door to her room to find a masked man in military fatigues pointing an assault rifle at her face, yelling, "Get down, palms in the air!" This man was defendant Richard Arell,

---

[5]According to Lewis's police report, Stachulski did say that he had not immediately reported the assault "because he was afraid of what would happen to him or possibly his friends."

an officer with the CNHSOU (though Arell, like all the CNHSOU officers, denies having been masked).

Jessica complied, lying on the floor in a prone position. She then thought she heard Officer Arell tell her that she could get up, but, after she pushed herself up into a crouching position, he shoved her back to the floor and screamed at her to stay down. As a result of the shove, Jessica's left kneecap struck the floor, causing a permanent injury for which she has since received medical treatment. She was then handcuffed, either by Arell or by defendant Richard Tyler, another officer with the CNHSOU who entered the room after Arell.[6] Arell then continued to hold his gun to her head another seven to ten minutes. After that, Jessica was brought into the living room.

In the meantime, Tom Mlodzinski rose from his bed in a different room after hearing the outer door breaking down and someone screaming "search warrant!" As he approached the door to his bedroom, he was confronted by a masked man in military fatigues carrying an assault rifle, who ordered him to get down on the ground. It turns out that this man was defendant

_____

[6]There is a factual dispute over who handcuffed Jessica:  in his deposition, Officer Tyler took credit for doing it, but Jessica testified in her deposition that "the first guy" to enter her room--Officer Arell--had done it. Arell, however, says he does not recall touching Jessica.

Christopher Tyler, an officer with the CNHSOU.  Tom complied with the order.  Another man, similarly armed and attired, then entered the room and handcuffed Tom's hands behind his back with a zip tie, placing both knees into Tom's back in the process (though Tyler denies that anyone knelt on Tom).  The man then held the gun to Tom's head until, after what he describes as a "short time," he was taken into the living room.[7]

One of the officers who had entered the Mlodzinskis' bedroom also pointed his assault rifle at Tina, who was still in bed wearing only her underwear, and screamed for her to get down on the floor.  When she said she was not wearing a top, the man allowed her to remain in bed, lying face down, and handcuffed her behind her back with zip ties.  Either this officer or another similarly armed and attired one then continued pointing his assault rifle at her head for a period of time that Tina has testified "seemed like it was forever but [was] almost half [an] hour."  At that point, a female officer with the NHSOU, wearing street clothes, entered the room.  She wrapped a sheet around Tina--who had been lying in bed uncovered--and escorted her into the living room.  Also in the living room by then were Tom and

--------

[7]The Mlodzinskis have yet to identify this officer and, as a result, do not assert any claim arising out of this alleged mistreatment of Thomas.

Jessica, as well as Amy Furmanick, who was Rothman's girlfriend at the time, and was holding the couple's then two-week old baby daughter in her arms.  Furmanick had not been handcuffed.[8]

Rothman, for his part, had encountered a CNHSOU officer while exiting the bedroom that Rothman shared with Furmanick and their baby.  Rothman obeyed a command to get down on the floor, was handcuffed, and was removed from the apartment without incident.  He estimates that the exchange took 15 seconds, including the time it took for an officer to pull shorts onto Rothman over his boxer shorts; the defendants acknowledge that he was arrested "immediately."  He was then placed in the back seat of a squad car parked outside.  He has never been a party here.

Back in the living room, Sergeant Lewis told the Mlodzinskis they were under arrest and read them their <u>Miranda</u> rights.  Also present were defendant Timothy Woodward of the Bristol Police Department, as well as at least one armed CNHSOU officer.  Lewis began asking the Mlodzinskis for the location of "the stick," taking out his own baton and saying, "I'm looking for one of these."  Lewis told them that he was not leaving without "the stick" and that they would remain under arrest until he found it.

---

[8]Furmanick was originally named as a plaintiff to this action, but her claims were dismissed without prejudice after her lawyer was allowed to withdraw because he could not contact her.

Referring to Furmanick's and Rothman's two week-old daughter, Lewis said, "We're going to take the baby away unless we get some answers."  Lewis denies making these threats, saying only that he "questioned [the Mlodzinskis] about the location of the baton." There is also conflicting testimony on whether the Mlodzinskis remained handcuffed during the questioning--they say they did, while Lewis says their handcuffs were off by the time he began talking to them--and for how long--they say for as long as 45 minutes after they were brought into the living room, but other testimony calls their timeline into dispute.

After the Mlodzinskis had been assembled in the living room, the CNHSOU officers who had entered the apartment left--with the exception of the female officer who had brought Tina into the living room, and another officer, apparently unarmed, who had agreed to give that woman a ride home.  Tina and Jessica recall that, in addition to those CNHSOU officers, another one who appeared to be the "head guy" did not leave until the Bristol officers finally did.  But the "head guy" in question, Commander Cormier, says that he left "within a minute or two" after the rest of the CNHSOU officers did, which, he recalls, was no more than 10 minutes after the initial entry.

At some point, Officer Ramsay brought Furmanick and Jessica, one at a time, into the kitchen for questioning.  Jessica says

her handcuffs were still on during this time, while Ramsay says
he is "close to one hundred percent sure that they weren't."
Jessica recalls that her cuffs were eventually removed after a
period of time that she estimates as exceeding one hour, just
before she and Ramsay accompanied Furmanick in going outside for
a smoke.  During the cigarette break, according to Jessica,
Ramsay said that if she didn't tell him what happened with
Rothman, "they were going to take my niece away from me."
Shortly thereafter, Jessica told Sergeant Lewis that Rothman and
Burchfield "beat up" Stachulski and that Rothman was "seen" (by
whom is unclear) with a nightstick around that time.

In the meantime, Tina's and Tom's zip-tie handcuffs were
taken off by a yet-unidentified Bristol police officer.  This was
done with a pair of cutters the officer had retrieved from Tom's
truck, parked in the driveway, and locked, so the officer had to
get Tom's car keys from him first.  After the cuffs were removed,
Tom then remained in the living room, watching television, while
Tina returned to her bedroom and dressed.  In conduct she has
since described as "voluntary," she then accompanied an officer
while he searched the apartment.

Tina later gave what she described in her deposition as a
"voluntary statement" to a Bristol police officer, though she
also testified that Sergeant Lewis told her that "he wasn't going

13

to leave my house until he had a statement." The statement recounted, in relevant part, that Rothman and Stachulski "had a fight" over Furmanick. Tina gave the statement around 5 a.m. Shortly thereafter, any remaining officers left the Mlodzinskis' home, after the search had been completed.[9]

The search uncovered three baggies containing small quantities of marijuana and a glass smoking pipe, as well as an 8-inch hunting knife hidden between the mattress and the boxspring of the bed where Rothman and Furmanick had been sleeping. But the police did not find a nightstick--or a firearm. Rothman eventually acknowledged hiding the baton under the stairs outside the apartment prior to the search, and disposing of the baton afterwards by throwing it into the river.

---

[9]Tina testified that the officers did not leave her apartment until some 90 minutes later, but she also testified that "after I wrote the statement they left," and that she gave the statement at 5 a.m. This apparent inconsistency is unimportant, however, as Tina does not say that the officers spent the extra 90 minutes doing anything but continuing the search, and there is no other evidence to that effect.

## III. **Analysis**

After agreeing to drop certain claims and defendants from the case, as already noted, the Mlodzinskis maintain the following claims against the following parties:

- unreasonable seizure in violation of the Fourth Amendment against the Bristol officers (count 1);

- common-law false arrest and imprisonment against the Bristol officers (count 3);

- vicarious liability against the Town of Bristol for the Bristol defendants' alleged common-law torts (count 4);

- excessive force in violation of the Fourth Amendment against CNHSOU officers Arell and Richard Tyler for their alleged treatment of Jessica, and against CNHSOU officer Christopher Tyler for his alleged treatment of Tina, as well as unreasonable seizure in violation of the Fourth Amendment against Cormier for the Mlodzinskis' continued detention in handcuffs following the entry (count 5);

- common-law assault and battery against Arell and Richard Tyler for their alleged treatment of Jessica, and against Christopher Tyler for his alleged treatment of Tina (count 6);

- common-law false arrest and imprisonment against Cormier for the Mlodzinskis' continued detention in handcuffs following the entry (count 7); and

- vicarious liability against the CNHSOU for its officers' alleged common-law torts (count 8).

Thus, the Mlodzinskis do not challenge the CNHSOU's tactics in entering the apartment as excessive force or on any other basis. Cf. Est. of Smith v. Marasco, 318 F.3d 497, 516-17 (3d Cir. 2003) (ruling that plaintiff presented a triable excessive

force claim arising from the use of a "special emergency response team" to enter his home); Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1190 (10th Cir. 2001) (refusing to extend qualified immunity against excessive force claims arising out of SWAT team's tactics in executing a warrant); Alexander v. City & County of S.F., 29 F.3d 1355, 1366-67 (9th Cir. 1994) (overturning summary judgment for defendants on an excessive force claim arising from the use of a "tactical team" to execute a warrant).  While this court is reluctant to second-guess the tactical decisions of highly trained law enforcement officers, who perform public service at great risk to themselves, the court nevertheless must register its concern over the use of the CNHSOU team to execute the warrants against Rothman by sending as many as ten officers, dressed in military fatigues and armed with assault rifles, into his family's apartment after breaking down the door with a battering ram at 4 a.m.  To protect citizens from excessive force, as guaranteed by the Constitution, "the activation of [a 'special emergency response team'] and the tactics of that unit" must be "a reasonable response . . . in the circumstances."  Smith, 318 F.3d at 517.

        As outlined above, while the Mlodzinskis do not challenge the entry itself, they do challenge what particular officers did

after they entered.  Their challenges, though spanning several different claims, fall into essentially two categories: (A) their continued detention in handcuffs after they were brought into the living room, and (B) the force that certain CNHSOU officers used in initially detaining Tina and Jessica.

### A.  Unreasonable seizure and false arrest and imprisonment by the Bristol officers and Cormier

### 1.  The parties' arguments

The Mlodzinskis' claims for unreasonable seizure in violation of the Fourth Amendment, and false arrest and imprisonment at common law, arise out of their continued detention in handcuffs after they were brought from their bedrooms into the living room.  The defendants argue that, in detaining the Mlodzinskis, they were acting within the scope of their "limited authority to detain the occupants of the premises while a proper search is conducted."  <u>Michigan v. Summers</u>, 452 U.S. 692, 705 (1980) (footnote omitted).  They further argue that, under the Court's subsequent decision in <u>Muehler v. Mena</u>, 544 U.S. 93 (2005), they used reasonable force to accomplish that

detention by keeping the Mlodzinskis in handcuffs, even for the 45 minutes alleged.[10]

In response, the Mlodzinskis argue that (1) their seizure exceeded the "investigative detention" authorized by Summers and therefore amounted to a "de facto arrest" unsupported by probable cause, (2) Summers also does not apply because "the purpose of the detention was to coerce information out of them," not to conduct the search authorized by the warrant, and (3) keeping them in handcuffs for 45 minutes was unreasonable, because "the extraordinary circumstances" that justified handcuffing for the duration of the search in Muehler were absent in this case.

As explained infra, Summers and Muehler foreclose the Mlodzinskis' first two arguments, so their claim for an unreasonable seizure fails insofar as it is based on the lack of probable cause for, or their interrogation during, their

---

[10]While the handcuffs were placed by CNHSOU officers, rather than Bristol officers, "'[a]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's excessive force can be held liable under section 1983 for his nonfeasance.'"  Torres-Rivera v. O'Neill-Cancel, 406 F.3d 43, 52 (1st Cir. 2005) (quoting Gaudreault v. Municip. of Salem, 923 F.2d 203, 207 n.3 (1st Cir. 1990)).  One of the Mlodzinskis' theories is that the Bristol officers engaged in such "nonfeasance" by not promptly removing the handcuffs placed by the CNHSOU officers.  Neither the Bristol officers nor Commander Cormier (who, though a CNHSOU officer, was also not personally involved in placing the handcuffs) argues that this theory does not apply here.

detention.  A rational jury could find, however, that the
defendants used more force than reasonably necessary by leaving
the Mlodzinskis in handcuffs during their detention, amounting to
an unreasonable seizure under the Fourth Amendment, and qualified
immunity does not shield the defendants from that claim.  Yet the
excessive force does not render the otherwise valid detentions
actionable as false arrest or imprisonment under state law.

### 2.  The governing law

The Fourth Amendment provides, in relevant part, that "[t]he
right of the people to be secure in their persons, houses,
papers, and effects, against unreasonable searches and seizures,
shall not be violated, and no Warrants shall issue, but upon
probable cause."  U.S. Const. Am. IV.  In Summers, the Supreme
Court articulated the Amendment's "general rule that every
arrest, and every seizure having the essential attributes of a
formal arrest, is unreasonable unless it is supported by probable
cause."  Id. at 700.  The Court also recognized, however, "the
exception for limited intrusions that may be justified by special
law enforcement interests" depending on "both the character of
the official intrusion and its justification."  Id. at 700-01.
One such exception, the Court ultimately held, was that "a
warrant to search for contraband founded on probable cause

19

implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." Id. at 705 (footnotes omitted).

In weighing the character of this intrusion, the Court concluded that "detention of one of the residents while the premises was searched, while admittedly a significant restraint on his liberty, was surely less intrusive than the search itself." Id. at 701 (footnote omitted).  The Court went on to identify three justifications for such seizures:  (1) "preventing flight in the event that incriminating evidence is found," (2) "minimizing the risk of harm to the officers," and (3) facilitating "the orderly completion of the search" because the occupants' "self-interest may induce them to open locked doors or locked containers to avoid the use of force that is not only damaging to property but may also delay completion of the task at hand." Id. at 702-03.

The Court later held in Muehler that, under Summers, "[a]n officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'"  544 U.S. at 98 (quoting Summers, 452 U.S. at 705 n.19).  In Muehler, the defendant police officers investigating "a gang-related, driveby shooting . . . had reason

20

to believe at least one member of a gang"--and one of the
suspects in the shooting--lived at the plaintiff's home.  Id. at
95.  After securing a warrant to search the home for "deadly
weapons and evidence of gang membership," the defendants entered
the house with a SWAT team due to "the high degree of risk
involved in searching a house suspected of housing at least one,
and perhaps multiple, armed gang members."  Id. at 94-95.
Officers encountered the plaintiff asleep in her bed, handcuffed
her at gunpoint, and removed her and three other handcuffed
people they had found into the garage.  Id. at 95.

     "While the search proceeded, one or two officers guarded the
detainees, who were allowed to move around the garage but
remained in handcuffs."  Id.  At some point during the detention,
a federal officer asked the plaintiff for her name, date and
place of birth, and immigration status.  Id.  The plaintiff and
the other detainees remained in handcuffs for the duration of the
search, which took between two and three hours.  Id. at 100.  She
was then released before the officers left the area.  Id. at 95.

      The court of appeals ruled that the plaintiff's detention
had violated the Fourth Amendment in two ways:  first, "it was
objectively unreasonable to confine her . . . and keep her in
handcuffs during the search," and, second, "the questioning of
[her] about her immigration status constituted an independent

Fourth Amendment violation." Id. at 97.  The Supreme Court disagreed on both counts.

The Court ruled that the plaintiff's "detention for the duration of the search was reasonable under Summers because a warrant existed to search [an address] and she was an occupant of that address at the time of the search." Id. at 98. Furthermore, while recognizing that "[t]he imposition of correctly applied hancuffs on [the plaintiff], who was already being lawfully detained during the search of the house, was undoubtedly a separate intrusion" and "thus more intrusive than that . . . in Summers," the Court ruled that the handcuffing "was reasonable because the governmental interest outweighed [that] marginal intrusion." Id. at 99 (citing Graham v. Connor, 490 U.S. 386, 396-97 (1989)).  As the court explained, "this was no ordinary search . . . a warrant authorize[d] a search for weapons and a wanted gang member reside[d] on the premises." Id. at 100. Even though "this safety risk inherent in executing a search warrant for weapons was sufficient to justify the use of handcuffs, the need to detain multiple occupants made the use of handcuffs all the more reasonable," particularly in light of the fact that only two officers were left to watch the detainees in the garage while the rest searched the house.  Id.

22

Finally, the Court disagreed with the court of appeals "that the officers were required to have independent reasonable suspicion to question [her] concerning her immigration status because the questioning constituted a discrete Fourth Amendment event." Id. at 100-01. Given the Court's holdings in prior cases that "mere police questioning does not constitute a seizure," and the lack of any finding by the court of appeals "that the detention was prolonged by the questioning, there was no additional seizure" and therefore no need for "reasonable suspicion to ask" the plaintiff about her immigration status. Id. at 101 (quotation marks omitted).

### 3. The Mlodzinskis' seizure claims

### a. Lack of probable cause

The Mlodzinskis appear to misunderstand Summers in claiming that their detention violated the Fourth Amendment because they were arrested without probable cause. As just discussed, Summers recognized an exception to the Fourth Amendment rule that probable cause support "every arrest, and every seizure having the essential attributes of a formal arrest." 452 U.S. at 700-01. So their argument that their detention was a "de facto arrest"--in other words, that it had "the essential attributes of a formal arrest"--is beside the point. Whatever the proper

23

categorization of the Mlodzinskis' seizure (and the defendants
have not contested that it was an arrest, at least while the
handcuffs were still on), it did not violate the Fourth Amendment
so long as it fell within the "limited authority to detain the
occupants of [a] premises while a proper search is conducted"
pursuant to a valid warrant to search for contraband, which was
itself founded on probable cause.  Id. at 705.

Summers holds quite clearly that no independent probable
cause is necessary; as the Mlodzinskis acknowledge, the Court
described the case as raising--and then establishing--"the
constitutionality of a pre-arrest 'seizure' which we assume was
unsupported by probable cause."[11]  Id. at 696.  And, if Summers
left any doubt, the Court expressly held in Muehler that the
authority to detain occupants of a home while a search warrant is
carried out there "does not depend on the 'quantum of proof
justifying detention or the extent of the intrusion to be imposed
by the seizure.'"  544 U.S. at 98 (quoting Summers, 452 U.S. at

---

[11]As the Court explained, it used the term "pre-arrest
'seizure'" in this passage to distinguish the detention at issue
from "'"arrests" in traditional terminology,'" which "'eventuate
in a trip to the station house and prosecution for crime.'"
Summers, 452 U.S. at 696 n.5 (quoting Terry v. Ohio, 392 U.S. 1,
16 (1968)).  Short of that, then, Sommers authorizes every other
"seizure having the attributes of formal arrest" when it is
effected against the occupants of a premises during the execution
of a valid warrant to search for contraband there.  Id. at 705.

705 n.19).  The lack of probable cause to arrest the Mlodzinskis
has no bearing on the validity of their detention here.

### b.    Interrogation

The Mlodzinskis also argue that their detention violated the
Fourth Amendment because it was intended "to coerce information
out of them."  Thus, they say, the detention exceeded the bounds
of the "temporary detention authorized by Summers," which "is
limited to the purposes for which it was created," i.e.
"preventing flight, minimizing risk of harm to the officers, and
facilitating the orderly completion of the search."  That
argument, though, was squarely rejected by Muehler when it
overturned the lower court's ruling that the defendants "should
have released [the plaintiff] as soon as it became clear that she
posed no immediate threat."  544 U.S. at 97.

Instead, as discussed above, the Court explained that the
plaintiffs' "detention for the duration of the search was
reasonable under Summers because a warrant existed to search [an
address] and she was an occupant of that address at the time of
the search."  Id. at 98.  The Mlodzinskis found themselves in
precisely the same situation and, accordingly, were subject to
detention for the entire length of the search, regardless of
whether it served what Summers identified as the typical

justifications for such a detention.  "Summers makes clear that

when a neutral magistrate has determined police have probable

cause to believe contraband exists, '[t]he connection of an

occupant to [a] home alone 'justifies a detention of that

occupant.'"  Id. at 99 n.2 (quoting Summers, 452 U.S. at 703-04)

(emphasis added).  Summers specifically noted, in fact, that its

rule does not require "balancing of competing interests" by

police officers making "an ad hoc determination" in each

individual case.  452 U.S. at 705 n.19).  In other words, as the

Court later held in Muehler, "[a]n officer's authority to detain

incident to a search is categorical."  544 U.S. at 98; see also

Dawson v. City of Seattle, 435 F.3d 1054, 1066 (9th Cir. 2006)

(reading Muehler "to mean that the duration of a detention may be

coextensive with the period of a search, and require no further

justification").

     It follows that, even if the detention were used for some

other purpose--such as interrogating the Mlodzinskis in the

manner they recall--there was still no violation of the Fourth

Amendment.[12]  Indeed, "the Supreme Court has repeatedly held that

_____

     [12]This is not to say that interrogating the occupants of a
home who have been detained during its search cannot violate
other constitutional provisions.  The court of appeals has held
that, depending on the circumstances, these interrogations can
violate the Fifth Amendment if the detainees have not been
advised of their Miranda rights.  See United States v. Mittel-

'subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.'" <u>United States v. Fernandez</u>, 600 F.3d 56, 62 (1st Cir. 2010) (quoting <u>Whren v. United States</u>, 517 U.S. 806, 813 (1996) (bracketing by the court omitted)).  In other words, "an officer's motive" for a detention, even if illegitimate, cannot "'invalidate objectively justifiable behavior under the Fourth Amendment.'" <u>Id.</u> at 62 n.6 (quoting <u>Whren</u>, 517 U.S. at 812) (bracketing omitted).

Nor does the fact that the questioning occurred (apart from what it suggests about the officers' motives) have any Fourth Amendment significance.  That is also clear from <u>Muehler</u> which, again, rejected the argument that questioning a detainee while carrying out a search of her home pursuant to a valid warrant "constituted an independent Fourth Amendment violation."  544 U.S. at 97.  Like the plaintiff there, the Mlodzinskis were subject to detention during the execution of the search warrant

---

<u>Carey</u>, 493 F.3d 36, 40 (1st Cir. 2007).  This court need not consider that point here, though, because (1) the Mlodzinskis have made no Fifth Amendment claim, (2) it is undisputed that they received their <u>Miranda</u> warnings before they were questioned, and (3) even without regard to the warnings, there was no Fifth Amendment violation anyway because their statements were never used against them in a criminal proceeding, <u>see</u> <u>Chavez v. Martinez</u>, 538 U.S. 760, 767 (2003).  While <u>Chavez</u> acknowledged that coercive questioning can amount to a substantive due process violation even if the answers are never used in a criminal proceeding against the plaintiff, the Mlodzinskis have made no such claim here, so the court need not consider it.

anyway, so "there was no additional seizure within the meaning of the Fourth Amendment" due to any interrogation.  Id. at 101.

As Muehler also holds, the outcome would be different if "the detention was prolonged by the questioning," because then the execution of the warrant could no longer serve to justify the detention.  Id.  But the Mlodzinskis have not disputed that the search of their home concluded right around the time the officers left the apartment, by which point any Fourth Amendment detention had certainly come to an end.  Thus, the search and the detention were coterminous, as Muehler expressly contemplates.  Id. at 96; see also Dawson, 435 F.3d at 1066.

For this reason, the Mlodzinskis cannot rely on Hall v. Ochs, 817 F.2d 920 (1st Cir. 1987), to make out a Fourth Amendment claim here.  The court of appeals ruled in Hall that, even if probable cause supported the plaintiff's arrest and detention at a police station, it was nevertheless unreasonable under the Fourth Amendment because the defendant police officer admitted that he "had made up his mind" to release the plaintiff if he signed a waiver of his right to sue the police.  Id. at 924.  In light of this admission, the court concluded that the plaintiff "was not being held to insure his appearance in court, or for any other reason related to [his] prosecution," but "for the sole purpose of gaining absolution for the prior violations"

28

of his civil rights by the police in arresting him (though the waiver was never enforced).  Id.  Indeed, the plaintiff was released as soon as he signed the waiver, rather than having to wait until the next morning for a bail hearing.  Id.  This, the court reasoned, amounted to "[c]onditioning [the plaintiff's] freedom on the waiver of his [F]irst [A]mendment right" to sue the police and therefore "deprived him of his right to liberty" from unreasonable restraint under the Fourth Amendment.  Id.

Here, though, there is no evidence that the Mlodzinskis' "freedom" was "conditioned" on the waiver of their "right not to speak to the police," as they put it.  While Lewis allegedly announced that "he wasn't going to leave [the] house until he had a statement" from Tina, it is undisputed that he did leave the house as soon as the search was completed.  See note 9 and accompanying text, supra.  And, again, the Mlodzinskis were lawfully subject to detention until that point.

At most, then, Lewis's alleged demand for a statement threatened a Fourth Amendment violation, i.e., detaining the Mlodzinskis beyond the duration of the search, that was never carried out.  Such unrealized threats do not implicate the Fourth Amendment, as this court and others have held.[13]  Nagy v. Town of

---

[13]A threat to hold a suspect until she makes a statement could, of course, render any resulting statement involuntary. Again, though, there is no such claim here.  See note 12, supra.

Andover, 2001 DNH 191, 15-16; see also, e.g., Palmieri v. Town of Babylon, No. 06-cv-0968, 2008 WL 3155153, at *13 (E.D.N.Y. Aug. 4, 2008); Brown v. Sweeney, 526 F. Supp. 2d 126, 132 (D. Mass. 2007); Bodek v. Bunis, No. 06-cv-6022, 2007 WL 1526423, at *9 (W.D.N.Y. May 23, 2007); Sterne v. Thompson, No. 05-cv-477, 2005 WL 2563179, at *4 (E.D. Va. Oct. 7, 2005).

Nor have the Mlodzinskis pointed to anything in the record suggesting that any aspect of the alleged interrogation, e.g., Lewis's initial demands for information, his subsequent demand for a statement from Tina, or Ramsay's questioning of Jessica "extended the time [they were] detained" so as to require a justification beyond that already provided by the execution of the warrant.  Muehler, 544 U.S. at 101; cf. Ganwich v. Knapp, 319 F.3d 1115, 1124 (9th Cir. 2003) (denying qualified immunity from a Fourth Amendment claim to defendants who "did precisely what the Summers Court warned was improper:  [they] exploited the detention, prolonging it to gain information from the detainees, rather than from the search").[14]

_____

[14]As this passage suggests, Summers noted that "special circumstances, or possibly a prolonged detention, might lead to a different conclusion in an unusual case."  452 U.S. at 705 n.20. But, as just discussed, there was no "prolonged detention," nor do there appear to be any "special circumstances" here (at least in the nature of the detention itself, as opposed to the force used to effectuate it).  Notably, the Muehler Court did not consider the detention there--which lasted for as long as three

As far as the court can tell from the record, the search began almost immediately after the officers entered the apartment and did not end until they left, and, even during those times when certain officers were allegedly questioning the Mlodzinskis, other officers were carrying on with the search.  The alleged interrogation does not support a Fourth Amendment claim.  See Muehler, 544 U.S. at 101.

### c.   State-law false arrest and imprisonment

Furthermore, the Bristol defendants are entitled to summary judgment on the Mlodzinskis' state-law claims for false arrest and imprisonment.  To prevail on either of these claims under New Hampshire law, the Mlodzinskis must show, among other things, that they were confined by the Bristol defendants "without legal authority."  MacKenzie v. Linehan, 158 N.H. 476, 482 (2009).[15]

As just discussed at length, the Bristol defendants had the legal authority to detain the Mlodzinskis during the execution of

--------

hours, and included questioning on topics unrelated to the search--to present any "special circumstances."

[15]As MacKenzie states, a false imprisonment claim arises out of "[a]ny period of unlawful confinement, however brief," 158 N.H. at 482 (quotation marks omitted), so that "[t]he difference between false arrest and false imprisonment is one of terminology only," 1 Isidore Silver, Police Civil Liability § 4.01[1], at 4-4 n.4 (rev. ed. 2010).

the search warrant at their home, so their false arrest and imprisonment claims cannot succeed.  See Lee v. City of N.Y., 709 N.Y.S.2d 102, 103 (N.Y. App. Div. 2000) (upholding dismissal of a common-law false imprisonment claim where "plaintiffs were detained by the police during the execution of a search warrant," which is "constitutionally permissible" under Summers).  The Bristol officers are entitled to summary judgment on the Mlodzinskis' state-law false arrest and imprisonment claims. Furthermore, because those claims were the only basis for any liability on the part of the Town of Bristol itself, see note 1, supra, the Town is entitled to summary judgment too.  See Dupont v. Aavid Thermal Techs., Inc., 147 N.H. 706, 714-15 (2002).

### d.  Excessive force

### i.  Liability

The Mlodzinskis argue that their seizure was unreasonable because they remained in handcuffs for at least 45 minutes after they were brought into the living room.  As the Court recognized in Muehler, "[i]nherent in Summers' authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention."  544 U.S. at 98-99 (citing Graham, 490 U.S. at 396).  Determining whether a seizure was reasonable "requires careful attention to the facts and

circumstances of each particular case, including the severity of
the crime at issue, whether the suspect poses an immediate threat
to the safety of the officers or others, and whether he is
actively resisting arrest or attempting to evade arrest by
flight." Graham, 490 U.S. at 396.  Furthermore, "[t]he
'reasonableness' of a particular use of force must be judged from
the perspective of a reasonable officer on the scene, rather than
with the 20/20 vision of hindsight." Id.

The Bristol officers argue that leaving the Mlodzinskis in
handcuffs, even for the 45 minutes they claim, amounted to
reasonable force as a matter of law.  Their argument, however,
does not address any of the particular "facts and circumstances"
of this case.  Instead, they take the position that, because they
were categorically authorized to detain the Mlodzinskis for the
duration of the search under Muehler, they were also
categorically authorized to use handcuffs to do so.  That is
incorrect.  As discussed supra, Muehler ruled that keeping the
plaintiff handcuffed during the entirety of the search was
reasonable in that particular case, not in all such cases.  See
Dawson, 435 F.3d at 1066 (holding that, while "the duration of a
detention may be coextensive with the period of a search" under
Muehler, the police do not have "unfettered authority to detain a
building's occupants in any way they see fit").

33

As <u>Muehler</u> explained, "[t]he imposition of correctly applied hancuffs" on a person "already being lawfully detained during [a] search" amounts to "a separate intrusion," i.e., beyond that imposed by the detention itself.  544 U.S. at 99.  There, the Court went on to weigh the degree of that intrusion against the governmental interest it served, concluding that the plaintiff's "2- to 3-hour detention in handcuffs <u>in this case</u> does not outweigh the government's continuing safety interests . . . . [T]his case involved the detention of four detainees by two officers during a search of a gang house for dangerous weapons."[16]  <u>Id.</u> at 99-100 (emphases added); <u>see also id.</u> at 102-03 ("The use of handcuffs is the use of force, and such force must be objectively reasonable under the circumstances")

_____

[16]Similarly, in a passage emphasized by the Bristol defendants, the Court observed that "<u>this</u> safety risk inherent in executing a search warrant for weapons was sufficient to justify the use of handcuffs."  544 U.S. at 100 (emphasis added).  "This safety risk," as described in the preceding two sentences, was that presented when "a warrant authorizes a search for weapons <u>and</u> a wanted gang member resides on the premises."  <u>Id.</u> (emphasis added).  Furthermore, the Court made this statement in analyzing the initial use of handcuffs to detain the plaintiff, then went on to address her argument that "the duration of the use of handcuffs made the detention unreasonable."  <u>Id.</u>  So, again, <u>Muehler</u> does not categorically authorize handcuffing the occupants of a home during the entirety of a search for weapons there.  <u>See id.</u> at 102 (Kennedy, J., concurring) (agreeing that the use of handcuffs was reasonable there, but "add[ing] [a] brief statement to help ensure that police handcuffing during searches becomes neither routine nor unduly prolonged").

(Kennedy, J., concurring).  But this case does not involve most, if any, of those factors, and therefore does not implicate the same "safety interests" as Muehler.

First, the detainees did not outnumber the officers:  by the time the Mlodzinskis were brought into the living room, there were between seven and ten CNHSOU officers, in addition to the four Bristol officers, still in the apartment, compared to only four detainees (not counting the 2-week old baby).  Even according to the defendants' version of events, at least two CNHSOU officers, in addition to all four Bristol officers, remained throughout the entirety of the search.  This is in contrast to Muehler, where "the detainees outnumber[ed] those supervising them, and this situation could not be remedied without diverting officers" from the search itself.[17]  544 U.S. at 103 (Kennedy, J., concurring).

Second, the home was not a "gang house" or, so far as the record indicates, the location of any potentially criminal activity whatsoever (save for the possession of a small amount of marijuana and a pipe, which has not been invoked as necessitating the continued use of handcuffs).  Bristol officers, in fact, had

---

[17]According to Lewis, he and Woodward conducted the search, which would have freed the four remaining officers to supervise the four remaining detainees.

35

the home under surveillance for nearly five hours prior to the search, but did not observe anything suspicious.  Similarly, Sergeant Lewis testified that, before the search, he knew Tom and Tina Mlodzinski lived there, but has not suggested he was aware of anything that would potentially make them--let alone their 15-year old daughter--dangerous.  "While the existence of a search warrant may, in some circumstances, support a reasonable belief that anyone present at the premises to be searched is engaged in criminal activity, that justification is significantly weakened when, as here, police know the occupant's identity and yet have no articulable reason for suspecting that person of criminal activity."  Heitschmidt v. City of Houston, 161 F.3d 834, 838-39 (5th Cir. 1998) (citation omitted).

Lewis did have reason to believe, of course, that Rothman was dangerous.  Yet Rothman had been removed from the home immediately after the CNHSOU officers had entered it, so even his demonstrated potential for violence could not have justified leaving the rest of his family in handcuffs for almost another hour beyond that.  And the Mlodzinskis did not resist arrest or attempt to flee at any point; to the contrary, they obeyed all of the officers' orders from the minute they were told to get down on the floor when the CNHSOU team entered the apartment.

36

Third, like in Muehler, the object of the search was a
"dangerous weapon"--unlike in Muehler, though, it was a
nightstick used when two teenagers attacked another one over a
girl, not a gun possessed by a gang member who had "recently been
involved in [a] driveby shooting."  544 U.S. at 95.  Sergeant
Lewis had been told by Stachulski, the victim of the assault,
that Rothman was "known to carry a firearm," but, again, Rothman
had been removed from the apartment nearly an hour before the
Mlodzinskis were released from their handcuffs, and there is
nothing to suggest that the officers were otherwise concerned
about the presence of a gun in the home.  It does not appear that
the officers ever asked any of the Mlodzinskis (or even Rothman,
for that matter) about a gun, despite the repeated questioning
about the location of the nightstick.

The "safety interests" that justified the continued
handcuffing of the detainees in Muehler, then, were largely
absent here.  And, as mentioned at the outset of this discussion,
the Bristol defendants do not point to anything else about this
particular case that supports keeping the Mlodzinskis handcuffed.
Even after Muehler, a number of courts have ruled, under
circumstances similar (if not identical) to those here, that the
continued handcuffing of detainees while executing a search
warrant could constitute excessive force.  See, e.g., Binay v.

Bettendorf, 601 F.3d 640, 650 (6th Cir. 2010) (though the warrant was for drug trafficking, the detainees "had no criminal record, cooperated throughout the ordeal, posed no immediate threat to the officers, and did not resist arrest or attempt to flee"); Tekle v. United States, 511 F.3d 839, 845-47 (9th Cir. 2006) (though the warrants were for drug trafficking, there was no "suspicion that there were deadly weapons and a gang member thought to be armed and dangerous on the premises" as in Muehler, yet a minor remained in handcuffs for 15 to 20 minutes after search of his person that "uncovered no weapons or anything else to warrant further concern for [officer] safety") (quotation marks omitted); Hepner v. Balaam, No. 03-681, 2007 WL 2033367, at *3 (D. Nev. July 10, 2007) (though the warrants authorized the search of a Hells Angels clubhouse and a nearby residence, "many law enforcement personnel were present" and plaintiffs "were patted down and found to have no weapons"); Schafer v. Ashworth, No. 06-cv-1259, 2008 WL 4736353, at *3 (E.D. Cal. Oct. 16, 2008) (though the warrant was for narcotics, and the teenaged plaintiff possessed "a small, inexpensive plastic knife in his pocket," he was "at all times submissive and cooperative," yet remained in handcuffs for three hours); Elliot v. Lator, No. 04-cv-74817, 2006 WL 1806475, at *12 (E.D. Mich. June 28, 2006) (though the warrant was for the weapons used in a robbery, "the suspected

armed robber was already in custody" so there was "no reason to believe that anyone on the premises posed a particular threat to the safety of the officers" and no "evidence that any Plaintiff behaved in a way that would have triggered any [such] concerns").

There is similar caselaw predating Muehler as well.  See, e.g., Baker v. Monroe Twp., 50 F.3d 1186, 1193 (3d Cir. 1995) (though the warrant was executed as part of a "drug raid," the police had no reason to feel threatened by a family, including two teenaged girls, "paying a social visit" to the premises, yet they were left handcuffed for as long as 25 minutes); Ingram v. City of Columbus, 185 F.3d 579, 592 (6th Cir. 1999) (though the officers chased a drug dealer into a home, they had no "general right" to handcuff the occupants); Heitschmidt, 161 F.3d at 839 ("Once the premises was secure and police were proceeding with their work without interference, there was no justification for prolonging the physically intrusive aspect of [plaintiff's] detention" in handcuffs, particularly where "there were between ten and twelve police officers in the home during the search"); United States v. Greathouse, 297 F. Supp. 2d 1264, 1276 (D. Or. 2003) ("no reason to believe that any of the residents posed a particular threat of harm or danger of flight . . . there were at least 10 and perhaps 11 officers and agents on the scene . . . there was no . . . evidence offered to suggest that [plaintiff]

(or anyone else in the residence) resisted arrest in any way");

United States v. Rodriguez, 68 F. Supp. 2d 104, 110 (D.P.R. 1999)

(though the warrant was for "firearms, narcotics, and

ammunition," a protective sweep did not turn up weapons, and

"there were about ten to fifteen agents in the house").

The Bristol defendants provide no authority to the

contrary.[18]  A rational jury could conclude that keeping the

Mlodzinskis in handcuffs amounted to "force that was unreasonable

under the circumstances" in violation of the Fourth Amendment.

Jennings v. Jones, 499 F.3d 2, 11 (1st Cir. 2007).


### ii.  Qualified immunity

The Bristol officers also argue that, even if a jury could

rationally find that they used excessive force in keeping the

Mlodzinskis handcuffed, summary judgment should nevertheless

enter in their favor by virtue of qualified immunity.  They bear

the burden of proving qualified immunity, an affirmative defense

protecting government officials from liability if they can show

---

[18]The Bristol defendants rely on United States v. Timpani,
665 F.2d 1 (1st Cir. 1981), which concluded that detaining the
occupant of a house for 45 minutes during the execution of a
search warrant was reasonable.  That case is inapposite to the
Mlodzinskis' excessive force claim, though, because the defendant
there was not handcuffed; the police merely "insisted that [he]
remain with them while they searched."  Id. at 2.

that their conduct, while illegal, did not violate "clearly established" constitutional rights.  See, e.g., DiMarco-Zappa v. Cabanillas, 238 F.3d 25, 35 (1st Cir. 2001).  In analyzing the defense, the court considers "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation."  Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009) (quoting Pearson v. Callahan, 129 S. Ct. 808, 815-16 (2009)).  The second step of the test "in turn, has two aspects.  One aspect of the analysis focuses on the clarity of the law at the time of the alleged civil rights violation . . . .  The other aspect focuses more concretely on the facts of the particular case, and whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights."  Id.

As just discussed, this court concludes that, taking the facts in the light most favorable to the Mlodzinskis, they can show a violation of their constitutional right to freedom from excessive force under the Fourth Amendment, so they survive the first step of the test.  See, e.g., Jennings, 499 F.3d at 11. Furthermore, the court of appeals has held that its "case law supplies a crystal clear articulation of the right, grounded in the Fourth Amendment, to be free from the use of excessive force

by an arresting officer," so the Mlodzinskis' excessive force claim survives the first "aspect" of the second step of the test as well.  Morelli v. Webster, 552 F.3d 12, 23 (1st Cir. 2009).

The Bristol officers' qualified immunity defense, then, turns on the second aspect of the second step of the test: whether their alleged "use of excessive force constituted the kind of erroneous judgment that a reasonable police officer under the same or similar circumstances might have made," such that "qualified immunity gives an officer the benefit of a margin of error."  Id. at 24.  The Mlodzinskis' excessive force claim survives this final part of the test as well.

As already noted, the Bristol officers--who, again, bear the burden of proving the defense--have pointed to no circumstances that could justify, to a reasonable officer, the Mlodzinskis' continued handcuffing.  They did not outnumber the officers; they had not resisted arrest, attempted to flee, or taken any action at all to threaten the safety of the officers, who were not aware of any other reason to believe they might be dangerous; and the only potentially dangerous person in the apartment, Rothman, had been removed from there immediately.  The absence of any of these factors places the Bristol officers' alleged "actions outside the universe of protected mistakes."  Morelli, 552 F.3d at 24 (denying qualified immunity from excessive force claim based on

physically restraining the plaintiff, given the lack of any "evidence of either dangerousness or attempted flight, and the presence of a cadre of other officers at the scene").

Relying on Muehler, the Bristol defendants argue that "officers may take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search in executing a search warrant" and that "[s]uch reasonable action includes the use of handcuffs in detaining occupants."  It is true that, "[i]f the officer's mistake as to what the law requires is reasonable, . . . the officer is entitled to the immunity defense."  Saucier v. Katz, 533 U.S. 194, 204-05 (2001). But, as discussed at length above, Muehler did not lay down a per se rule authorizing the use of handcuffs to detain the occupants of a home while executing a warrant regardless of whether using that force is reasonable--nor could a reasonable officer understand such a rule to have been adopted.  The Bristol defendants have not identified any case law at all supporting their contrary view.

Yet, as just discussed, there are numerous decisions pre-dating Muehler--and therefore the events at issue here, which occurred just months after that decision issued--that recognize excessive force claims based on handcuffing occupants while carrying out a warrant under circumstances closely analogous to

43

the ones that confronted the Bristol officers here.  This case law therefore served to give them "reasonable notice that the conduct [they are] alleged to have committed in this litigation is unlawful."  Riverdale Mills Corp. v. Pimpare, 392 F.3d 55, 66 (1st Cir. 2004).  Indeed, as the Sixth Circuit Court of Appeals has held, "the law is clearly established that the authority of police officers to detain the occupants of the premises during a proper search for contraband is 'limited' and that officers are only entitled to use 'reasonable force' to effectuate such a detention.'"  Binay, 601 F.3d at 652 (citing Summers, 452 U.S. at 705, and Muehler, 544 U.S. at 98) (denying qualified immunity to officers who unreasonably kept the occupants of a home handcuffed while executing a search warrant there); see also Tekle, 511 F.3d at 850 (same); Schafer, 2008 WL 4736353, at *5-*6 (same).  The Bristol defendants are not entitled to qualified immunity from the excessive force claim, at least when the facts are taken in the light most favorable to the Mlodzinskis.[19]

---

[19]As discussed in Part II, supra, Lewis says that the Mlodzinskis' handcuffs were removed shortly after they were brought into the living room, just before he began interacting with them.  The court has not considered whether, on this version of events, the Mlodzinskis could make out a successful excessive force claim against the Bristol officers or, if so, whether qualified immunity would apply.

**B.    Excessive force and assault and battery by CNHSOU officers**

Tina and Jessica claim that they were subjected to excessive force in violation of the Fourth Amendment, as well as assault and battery at common law, by the CNHSOU officers who allegedly kept their rifles pointed at them for several minutes after they had been handcuffed.  Like their Bristol counterparts, these CNHSOU officers argue that even this alleged use of force was reasonable as a matter of law (and therefore privileged under state law) but that, even if not, reasonable officers in their position would have believed that it was, entitling the CNHSOU officers to qualified immunity (or official immunity, in the case of the state law claim).  The CNHSOU officers also argue that, because the Mlodzinskis did not "identify which CNHSOU member, if any, used the alleged excessive force" against them, any claims arising out of it fail for that reason as well.

**1.    Identity of the officers**

Taking the CNHSOU officers' last argument first, it is inconsistent with the record.  There is evidence that either Officer Richard Tyler or Officer Arell handcuffed Jessica, and that Arell proceeded to hold his gun to her head.  <u>See</u> note 6, <u>supra</u>, and accompanying text.  While Arell denies touching Jessica, she identified him as the one who shoved her to the

floor and handcuffed her, and this dispute presents a factual question to be resolved by the jury.

Similarly, there is evidence that, even if it does not permit the inference that Officer Christopher Tyler was the man who handcuffed and held Tina at gunpoint, at least places him in the room while another officer did so.  That could make Christopher Tyler responsible for the allegedly excessive force, even if he did not personally apply it, see note 10, supra, and the CNHSOU officers have not argued that this theory would not apply here.  They are not entitled to summary judgment based on the claimed lack of evidence identifying the officers responsible for the allegedly excessive force against Jessica and Tina.[20]

### 2.   The Fourth Amendment claim

### a.   Liability

In arguing that the force they used was reasonable as a matter of law, the CNHSOU officers, like their Bristol counterparts, rely principally on the fact that they were executing a search warrant for a weapon, which, they say, "alone was sufficient to justify the use of handcuffs on all present"

---

[20]The Mlodzinskis concede that they cannot identify the officer who allegedly handcuffed Tom by placing a knee in his back, and that Tom has no excessive force claim as a result.  See note 7, supra.

under Muehler.  As already discussed in detail, however, Muehler
did not hold that handcuffing the occupants of a home while
executing a warrant to search for a weapon can never amount to
excessive force, only that it did not under the circumstances
presented there.  And, as also already discussed in detail, the
circumstances in Muehler differed from the circumstances here in
a number of important ways:  there were more than twice as many
officers as there were occupants, the apartment was not the
suspected site of gang-related or any other criminal activity,
and the object of the search was a nightstick, not a gun used in
a drive-by shooting by a wanted gang member.

     Furthermore, all of the home's occupants readily complied
with the CNHSOU officers' orders to get down on the ground (or,
in Tina's case, to lay face down in her bed) with their palms up.
They did not attempt to flee or resist.  The officers did not
find a weapon on anyone's person--not surprisingly, since the
Mlodzinskis were wearing little more than their underwear--nor
did they have any other reason to suspect that Tina, a woman in
her 40s, or Jessica, a 15 year-old girl, was the suspect, or was
otherwise dangerous.  Indeed, defendant Stephen Adams, one of the
CNHSOU officers who participated in executing the warrants here,
and who is now an assistant commander, testified that there would
"be no need to" handcuff a 15 year-old girl while executing a

warrant unless she was violent or was herself a suspect.  Jessica

was neither.  As noted in Part III.A.3.*i*, supra, a number of

courts have ruled that a triable excessive force claim arose out

of handcuffing the occupants of a home while carrying out a

search under similar circumstances.

In any event, the responsible CNHSOU officers allegedly did

more than just handcuff Jessica and Tina:  one held his assault

rifle to Jessica's head for what she says was between seven and

ten minutes, while another held his assault rifle to Tina's head

for what she says seemed like half an hour.  The CNHSOU officers

have not come forward with any justification for holding weapons

to the heads of Jessica and Tina, particularly after they had

already been handcuffed.[21]  "Where a person has submitted to the

officers' show of force without resistance, and where an officer

has no reasonable cause to believe that person poses a danger to

the officer or to others, it may be excessive and unreasonable to

continue to aim a loaded firearm directly at that person."

Holland, 268 F.3d at 1193; see also Baird v. Renbarger, 576 F.3d

---

[21]Officers Arell and Richard Tyler have testified that, in accordance with standard CNHSOU procedures, they in fact held their weapons at the ready, at a 45-degree angle to the ground. They do not deny, however, pointing their rifles at the heads of Jessica and Tina.  In any event, both women testified unequivocally that the guns were pointed at their heads, and it is their version of the facts that controls at this stage.

340, 346 (7th Cir. 2009) ("pointing guns at persons who are compliant and present no danger is a constitutional violation").

A number of courts have found triable excessive force claims to arise from the continued pointing of weapons at detainees under circumstances similar (if not identical) to those here. See, e.g., Baldwin v. Placer County, 418 F.3d 966, 970 (9th Cir. 2005) (there was no evidence that plaintiffs would resist or flee, or to justify believing they would be armed); Jacobs v. City of Chi., 215 F.3d 758, 773-74 (7th Cir. 2000) (an "officer kept [his] gun pointed at [plaintiff] for over ten minutes, even after ascertaining that [he] was not the person [the officer] was looking for, and during which time [plaintiff] did nothing . . . threatening"); Baker, 50 F.3d at 1193 (police handcuffed plaintiffs at gunpoint with no "reason to feel threatened by [them], or to fear [they] would escape"); Ingram, 185 F.3d at 592 (though the officers chased a drug dealer into a home, they had no "general right to handcuff and detain at gunpoint the occupants . . . in order to apprehend" the suspect).

In addition, as the Mlodzinskis emphasize, a number of courts have found triable excessive force claims to arise from pointing guns at children while executing a search warrant, reasoning that they generally pose less of a safety risk than adults.  See, e.g., Tekle, 511 F.3d at 845-46 (officers held the

49

11 year-old plaintiff "handcuffed, with their guns pointed at
him, for ten to fifteen minutes"); Holland, 268 F.3d at 1192
(pointing guns at children, ages 18, 14, and 8, for "nearly 10
minutes" after they complied with orders to lie face-down on the
ground); McDonald ex rel. McDonald v. Haskins, 966 F.2d 292, 294
(7th Cir. 1992) ("holding a gun at the head of a 9 year-old"
despite "the alleged absence of any danger to [the officer] or
other officers at the scene and the fact that the victim, a
child, was neither a suspect nor attempting to evade the officers
or posing any other threat"); Lucas v. City of Boston, No. 07-cv-
10979, 2009 WL 1844288, at *22 (D. Mass. June 19, 2009) (pointing
"weapons directly at the heads of two young children"); Schaefer,
2008 WL 4736353, at *3 (pointing guns at the head of a 14 year-
old boy, even though he possessed "a small, inexpensive plastic
knife," when he "was at all times submissive and cooperative").

Los Angeles County v. Rettele, 550 U.S. 609 (2007), on which
the CNHSOU defendants rely heavily, is not to the contrary.
There, the defendant deputies obtained a warrant to search a
house where they believed they could find the suspects in "a
fraud and identity-theft crime ring," one of whom held a
registration for a handgun.  Id. at 610.  In executing the
warrant at 7 a.m., the deputies entered the plaintiffs' "bedroom
with guns drawn and ordered them to get out of their bed and to

show their hands," despite their protests that they were not dressed--and despite the fact that they did not fit the physical description of the suspects.  Id. at 611.  Nevertheless, the plaintiffs remained "at gunpoint for one to two minutes" before they were permitted to dress, and under arrest for "three to four minutes" more, before the deputies realized their mistake, apologized, and left the house.  Id.

Rejecting the plaintiffs' claim that this amounted to an unreasonable seizure in violation of the Fourth Amendment, the Court ruled that the deputies, "who were searching a house where they believed a suspect might be armed, possessed authority to secure the premises before deciding whether to continue with the search."  Id. at 613.  The Court explained that ordering the plaintiffs from bed was "permissible, and perhaps necessary, to protect the safety of the deputies.  Blankets and bedding can conceal a weapon, and one of the suspects was known to own a firearm."  Id. at 614.  The Court further recognized that the "deputies needed a moment to secure the room and ensure that other persons were not close by or did not present a danger." Id. at 615.  Yet the Court cautioned that "[t]his is not to say, of course, that the deputies were free to force [the plaintiffs] to remain motionless . . . for any longer than necessary . . . to protect their safety."  Id.

Here, however, a rational jury could find that the responsible CNHSOU officers forced Tina and Jessica to remain motionless for longer than necessary through the use of handcuffs and, allegedly, loaded weapons pointed at their heads.  According to the Mlodzinskis, the use of that force continued for much longer than the "one or two minutes" the plaintiffs were held at gunpoint in <u>Rettele</u>, or, more importantly, the time the officers needed to "secure the room" by ensuring that Tina and Jessica were unarmed, did not otherwise pose a threat, and were unaccompanied by others who might.  It bears repeating here that Rothman, the only person in the apartment whom the officers believed to be dangerous or to possibly have a gun, had been arrested and removed immediately after the officers entered. Moreover, in contrast with <u>Rettele</u>, the officers were not carrying out a warrant against a suspected "crime ring," but against a suspect in an assault, so, unlike the officers there, they had no reason to fear that Tina and Jessica were "engage[d] in joint criminal activity" with Rothman.  550 U.S. at 613.

Under these circumstances, a jury could rationally find that the responsible CNHSOU officers subjected Tina and Jessica to excessive force by holding them handcuffed and with guns to their heads for the extended periods they recall.  <u>See</u> <u>Lucas</u>, 2009 WL 1844288, at *20 (distinguishing <u>Rettele</u> as a case of "officers

52

pointing guns at adults who the officers had some reason to suspect were cooperating with dangerous suspect," and denying summary judgment to officers who pointed guns at two children).[22]

### b.   Qualified immunity

The CNHSOU officers also seek summary judgment on qualified immunity grounds, arguing that, even if a jury could find that their actions amounted to excessive force, they were nevertheless "objectively reasonable."  The court disagrees, for much the same reasons it disagrees that the Bristol officers are entitled to qualified immunity.  See Part III.A.3.*b*, supra.  While, as the CNHSOU officers emphasize, they had been told "that the suspect to be apprehended had recently committed a violent assault with a deadly weapon and was known to have a gun," they do not explain how a reasonable officer would have understood that information

---

[22]The other cases cited by the CNHSOU defendants are similarly inapposite because the force allegedly used there was considerably less than the force allegedly used against Tina and Jessica here.  In both Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force, 379 F.3d 293, 305 (5th Cir. 2004) and Solis-Alarcon v. United States, 514 F. Supp. 2d 185, 199 (D.P.R. 2007), the officers executing the warrant merely had their guns drawn.  They were not holding them to the heads of handcuffed detainees, as the Mlodzinskis allege here.  And Isom v. Town of Warren, 360 F.3d 7, 11 (1st Cir. 2004)--where the police used pepper spray against "a distraught, seemingly suicidal man, who had briefly held two hostages and was refusing to comply with continuous officer requests that he put down an axe"--could hardly be more different from this case.

to justify the force they allegedly used against Tina and Jessica--as opposed to Rothman, who was the violent suspect in question.  Cf. Ingram, 185 F.3d at 597-98 (explaining that, if officers reasonably but mistakenly believed one of the occupants of the home was the fleeing suspect, they could have used appropriate force in handcuffing him face-down on the floor at gunpoint).  Nor, as already discussed at length, does the record disclose any such justification; to the contrary, one of the CNHSOU's assistant commanders has testified, in essence, that there was "no need" even to handcuff Jessica.

And the mere fact that the search warrant had issued during the investigation of a violent crime would not, in and of itself, lead a reasonable officer to believe he could legally handcuff and hold Tina and Jessica at gunpoint for several minutes.  That much is clear from Muehler itself which, again, authorizes only "reasonable force to effectuate the detention" of a home's occupants while executing a search warrant.  544 U.S. at 98-99. See also Baird, 576 F.3d at 345 (noting that, while the defendants in Muehler "pointed their guns at people during the execution of a search warrant," the facts there "revealed a serious potential danger to the police").

It is also clear from the numerous cases, preceding the events at issue here, that recognized excessive force claims for

54

handcuffing or holding the occupants of a home at gunpoint, even while executing a search warrant for potentially violent criminal activity.  See Baker, 50 F.3d at 1193 (warrant for drug trafficking); Holland, 268 F.3d at 1193 (warrant for assault by throwing victims "to the ground where they were kicked and beaten, often by several men at once"); Jacobs, 215 F.3d at 773-74 (warrant for drug trafficking); cf. Ingram, 185 F.3d at 592 (pursuit of fleeing drug dealer).  Based on this body of law, a number of courts have denied qualified immunity to officers for handcuffing or pointing weapons at the occupants of a home under similar circumstances.  See, e.g., Binay, 601 F.3d at 652; Baird, 576 F.3d at 347; Tekle, 511 F.3d at 850; Holland, 268 F.3d at 1197; Jacobs, 215 F.3d at 774.  The CNHSOU officers provide no authority to the contrary.[23]  Their motion for summary judgment on the Mlodzinskis' Fourth Amendment claim is denied.

---

[23]Indeed, the CNHSOU officers' summary judgment brief does not even address the evidence that they pointed guns at Tina and Jessica, but instead relies on the officers' version of events, i.e., that they held their weapons toward the floor, to claim that no reasonable officer would have thought that excessive. Again, that is not the version of events that controls at the summary judgment stage.

### 3.    The state-law assault and battery claim

Finally, the CNHSOU officers argue that they cannot be liable on the Mlodzinskis' state-law claims for assault and battery because they acted reasonably in using the alleged force against the Tina and Jessica.  In New Hampshire, "[a] law enforcement officer is justified in using non-deadly force upon another person when and to the extent that he reasonably believes it necessary to effect an arrest or detention."  N.H. Rev. Stat. Ann. § 627:5.  Under this statute, though, "[w]hether the defendant's beliefs were 'reasonable' is determined by an objective standard.  A belief that is unreasonable, even though honest, will not support the defense."  New Hampshire v. Cunningham, 159 N.H. 103, 107 (2009) (citation omitted).

As just discussed, the CNHSOU officers have not shown an objectively reasonable belief that, to effect the detention of Tina and Jessica while executing the warrant, they needed to handcuff them and hold them at gunpoint for as long as they allegedly did.  So, just as the CNHSOU officers are not entitled to summary judgment on the Fourth Amendment excessive force claim against them on this basis, they are not entitled to summary judgment on the state-law assault and battery claim against them

56

either.[24]   Cf. Statchen v. Palmer, 2009 DNH 137, 25-26 (noting
that the standards for the claims are essentially the same).

The CNHSOU officers also argue that, even if a jury could
rationally find that they assaulted and battered Tina and Jessica
by using unreasonable force to detain them, that claim would be
barred by the state-law doctrine of official immunity.  Under
that doctrine, "municipal police officers are immune from
personal liability for decisions that are:  (1) within the scope
of their official duties while in the course of their employment;
(2) discretionary, rather than ministerial; and (3) not made in a
wanton or reckless manner."  Everitt v. Gen. Elec. Co., 156 N.H.
202, 219 (2007).  The defendant bears the burden of proving that
official immunity shields the acts in question.  See Belcher v.
Paine, 136 N.H. 137, 145 (1992).

Assuming, without deciding, that the CNHSOU officers were
carrying out their official duties while in the course of their
employment, and undertaking discretionary acts, while detaining
Tina and Jessica, the CNHSOU officers have failed to establish

---

[24]The CNHSOU officers also argue that they cannot be liable
for assault and battery because they did not intend to cause any
injury to Tina or Jessica.  That reflects a fundamental
misunderstanding of tort law.  The "intent" required for a
battery claim is not "a desire to injure" the plaintiff, but the
intent "to cause a harmful or offensive contact" with the
plaintiff.  Restatement (Second) of Torts § 13 cmt. c (1965).

that they were not acting in a wanton or reckless matter while doing so.  This follows from the fact that, as just discussed above, they have failed to establish that a reasonable officer in their position would have believed his conduct was consistent with the Mlodzinskis' Fourth Amendment rights.  See Binay, 601 F.3d at 653 (upholding denial of official immunity from assault and battery claim arising out of excessive force during arrests for the same reasons for upholding denial of qualified immunity from overlapping Fourth Amendment claim).  The CNHSOU defendants' motion for summary judgment on the assault and battery claim by Tina and Jessica is denied.

## IV.  **Conclusion**

For the foregoing reasons, the Bristol defendants' motion for summary judgment[25] is GRANTED as to count 1, insofar as it arises out of the lack of probable cause or the alleged interrogation of the Mlodzinskis, but otherwise DENIED as to that count; and GRANTED as to counts 2, 3, and 4.  The CNHSOU defendants' motion for summary judgment[26] is GRANTED as to count 6 as to all defendants but Cormier, Arell, Richard Tyler, and

---

[25]Document no. 37.

[26]Document no. 36.

Christopher Tyler, as to whom it is DENIED; GRANTED as to count 7 (which alleges Cormier's liability for common-law false arrest and imprisonment); and GRANTED as to count 8 insofar as it alleges the CNHSOU's vicarious liability for the false arrest and imprisonment, but DENIED as to count 8 insofar as it alleges the CNHSOU's vicarious liability for the assault and battery.

As a result, the following defendants are terminated from the case:  the Town of Bristol, Steven Henry, Bill Jolly, Matt Culver, Rick Paulsen, Brad Sargent, Stephen Adams, Scott Thompson, Todd Eck, and Shawn O'Keefe.


**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  July 16, 2010

cc:  Matthew J. Lahey, Esq.
     Charles P. Bauer, Esq.
     Jeanne P. Herrick, Esq.
     K. Joshua Scott, Esq.
     William G. Scott, Esq.